**IN THE UNITED STATES**
**THE SOUTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| SAMUEL C. HOOD, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Case No._____ |
| MARION HOSPITAL CORPORATION | ) | |
| d/b/a HEARTLAND REGIONAL | ) | |
| MEDICAL CENTER, | ) | <u>TRIAL BY JURY DEMANDED</u> |
| JOHN WALSH, and | ) | |
| GAY HUFF, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>COMPLAINT</u>

NOW COMES Plaintiff Samuel C. Hood, Jr. ("Hood") by and through his attorney, Shari R. Rhode of the Rhode Law Firm, and for his Complaint against Defendants Marion Hospital Corporation d/b/a/ Heartland Regional Medical Center ("Heartland"), John Walsh ("Walsh"), and Gay Huff ("Huff"), states as follows:

### <u>NATURE OF THIS ACTION</u>

This is an action to correct unlawful employment practices on the basis of race and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C § 2000e *et seq.*; the Civil Rights Act of 1866, 42 U.S.C. § 1981; the Illinois Human Rights Act, 775 ILCS 5/1-109, *et seq.*; the Family Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.*; and the Illinois Whistleblower Act, 740 ILCS 174/1 *et seq.*

### <u>JURISDICTION AND VENUE</u>

1.      The jurisdiction of this Court is based on federal questions under 29 U.S.C. §§ 1331 and 2617 and supplemental jurisdiction under 29 U.S.C. § 1367.

2.      The venue for this action lies in the Southern District of Illinois in that all the acts alleged as part of this Complaint took place in said district.  29 U.S.C. § 1391.

3.      Hood has complied with all administrative prerequisites by filing a timely charge of discrimination and retaliation with the Equal Employment Opportunity Commission which was cross-filed said charge with the Illinois Department of Human Rights.  This action is filed within ninety (90) days of Plaintiff having received a Right to Sue dated February 23, 2021; a copy of which is attached as Exhibit A.

## PARTIES

4.      At all times relevant herein, Hood was and is a resident of Marion, Illinois.

5.      At all times relevant herein, Heartland was and is an Illinois Corporation with its principal place of business located in Marion, Illinois, and has continuously employed at least 50 people.

6.      Heartland is a hospital which is wholly owned and operated as a subsidiary of Quorum Health Corporation ("QHC").

7.      At all times relevant herein, Heartland was and is an employer within the meaning of 42 U.S.C. § 2000e(b).

8.      At all times relevant herein, Heartland was and is an employer within the meaning of 775 ILCS 5/2-101(B).

9.      At all times relevant herein, Heartland was and is an employer within the meaning of the FMLA under 29 U.S.C. § 2611(4)(A)(i).

10.     Huff is, and at times relevant hereto, was the Chief Financial Officer ("CFO") at Heartland and acted directly in the interest of Heartland as one of Hood's supervisors.

11.     Huff is an employer within the meaning of 29 U.S.C. § 2611(4)(A)(ii).

2

12.    Walsh is, and at times relevant hereto, was the Chief Executive Officer ("CEO") at Heartland and acted directly in the interest of Heartland as one of Hood's supervisors.

13.    Walsh is an employer within the meaning of 29 U.S.C. § 2611(4)(A)(ii).

## GENERAL FACTS

14.    Hood was employed as the Director of Human Resources at Heartland beginning on February 2, 2015.

15.    Prior to February 13, 2020, Hood had a five (5) year employment history with Heartland of greater than satisfactory annual evaluations and no disciplinary actions.

16.    Hood received a superior evaluation on December 31, 2019, with a high merit increase based on his previous year's performance from then-CEO Melissa Adkins ("Adkins").

17.    QHC is the parent company that provides Human Resource rules and oversights for many hospitals including Heartland and Crossroads Community Hospital ("Crossroads") in Mt. Vernon, Illinois.

18.    Heartland and Crossroads are less than 50 miles apart; both located in Southern Illinois.

19.    Some administrators, such as certain compliance officers and director of referrals at Heartland also are in charge of the same areas of respective responsibilities at Crossroads.

20.    On February 20, 2019, William Davis ("Davis"), a black man, applied for the Chief Operating Officer ("COO") position at Heartland.

21.    Davis was denied an interview by Martin D. Smith ("Smith"), President and COO of QHC on April 24, 2019.

22.    Davis' interview was denied after Huff, Davis' immediate supervisor, communicated with Smith and fabricated that Davis was not qualified for the position in an attempt to bar Davis' career advancement.

23. On July 8, 2019, Vince Green ("Green"), a white male, was hired at Heartland as COO.

24. Green had less operational experience than Davis.

25. Instead of interviewing, considering, and promoting Davis to the COO position, Smith created the position of Assistant Administrator to the CEO for Davis.

26. Davis was placed into that position on or about May 1, 2019.

27. Davis' position of Assistant Administrator to the CEO was an equally responsible executive-level position to Green's.

28. Davis was also required to perform the responsibilities of his original job as Director of Materials Management along with those of Assistant Administrator to the CEO.

29. Davis was not compensated any additional money for performing the responsibilities of his original job in addition to his new job.

30. Green was paid $56,000 *more* annually for his one job then Davis was for his two jobs.

31. On July 14, 2019, John Schmidt ("Schmidt"), a white male, was hired at Heartland as Assistant Chief Financial Officer ("ACFO").

32. Smith was paid an annual rate of $23,000 in wages *more* than was paid to Davis for his executive-level position.

33. On September 25, 2019, Michelle Darnell ("Darnell"), a white female, was hired at Crossroads as Assistant Chief Operating Officer ("ACOO").

34. Darnell was paid approximately $11,000 *more* than Davis for his executive-level position, even though she had fewer responsibilities at a smaller hospital.

35. Hood brought these race and gender wage disparities to his supervisors' attention, including Huff, in October 2019, because he believed Davis' wage disparity did not comply with Heartland's Affirmative Action Plan or State or Federal laws.

36. Huff, Davis' supervisor, refused to take corrective action to eliminate the race/gender wage disparities identified by Hood.

37. No one else at Heartland took corrective action either.

38. On December 20, 2019, Hood submitted recommendations for a wage increase to the then-CEO Adkins for approval, to correct the race/gender disparity with Davis' wages.

39. On or about January 4, 2020, before Adkins responded and almost immediately after Adkins left Heartland to accept another position, Huff denied the recommendation.

40. Huff returned the recommendations to Hood without approval.

41. By the beginning of 2020, Ashia Sweet ("Sweet"), a black female employee at Heartland reported to Hood that she was being discriminated against on the basis of her race and subjected to a racially hostile work environment by her white supervisor.

42. Hood advised Huff of Sweet's racial complaints.

43. Hood did not advise the supervisor accused of racial discrimination by Sweet because no charge(s) had yet been formally made against that supervisor.

44. In accordance with Heartland's policy, the subject of a complaint (Sweet's supervisor) was not supposed to be advised of the allegations until and unless formal charges were filed.

45. A purpose of the policy mentioned in paragraph 44 is to prevent retaliation to the complaining party.

46. At the beginning of January 2020, QHC appointed Tony Barber ("Barber"), a consultant, as Interim Chief Executive Officer ("ICEO") at Heartland and Hood's immediate supervisor.

47. Huff informed Barber of Sweet's racial complaint.

5

48.   On January 10, 2020, Hood began an investigation into the complaint made by Sweet per Heartland's investigation/employee complaint policies and procedures.

49.   On January 13, 2020, Hood was chastised by Huff and Barber for commencing the investigation.

50.   Hood communicated the situation and his reprimand from Huff and Barber to QHC Corporate Director of Human Relations, Reva Weems ("Weems").

51.   Weems was in Hood's corporate chain of command for company HR issues.

52.   Hood asked Weems for guidance on how to proceed with the investigation pursuant to Heartland's Employee Complaint Procedures.

53.   Weems directed Hood to discontinue communications with both Huff and Barber regarding the investigation; complete the investigation; and send the findings to her and Terry Johnson ("Johnson"), Sr. VP of Human Resources for QHC, for further direction.

54.   Shortly thereafter, Huff, Barber, and Smith directed Hood to stop the investigation of the complaints.

55.   In deliberate and wanton disregard of Heartland's employee complaint/investigation procedures, Huff and Barber informed the accused white supervisor of Sweet's complaints, allowing the supervisor to impose retaliation and ratchet up the intensity of the consequential pervasive hostile work environment conditions on Sweet.

56.   After Huff, Barber, and Smith directed Hood to stop his investigation, Huff immediately began removing job responsibilities and Human Resources personnel from Hood's supervision.

57.   On January 16, 2020, in an effort to follow company policy and ensure unlawful discrimination and retaliation were addressed, Hood contacted Johnson for direction on

how to proceed.

58.   Johnson told Hood that "Marty [Smith] asked you to stand down for now, so that is simply what we do."

59.   On January 22, 2020, Huff directed the reduction of Hood's annual merit increase, which had already been approved by then-CEO Adkins and QHC.

60.   On January 22, 2020, Huff also directed the reduction of previously approved annual merit salary increases of all other employees supervised by Hood who were involved in the discrimination investigation led by Hood.

61.   On January 23, 2020, Hood met with Walsh, the newly appointed QHC corporate CEO and Hood's new immediate supervisor, and reported to Walsh that he was being retaliated against by Huff and Barber for bringing forward race and gender discrimination complaints.

62.   Walsh directed Hood to complete the investigation.

63.   Walsh took no further action in investigating Hood's own retaliation complaint.

64.   On January 23, 2020, Huff removed payroll responsibilities and payroll personnel from Hood's supervision.

65.   On January 24, 2020, Huff removed educational and informatics responsibilities from Hood's supervision.

66.   On January 24, 2020, Huff removed the Manager of Education/Informatics from Hood's supervision.

67.   On January 24, 2020, Huff instructed Green to make plans to move the Human Resources department, which was supervised by Hood, to a location off hospital premises.

68.     On January 29, 2020, Hood completed his investigation and reviewed the investigation findings which included findings of racial discrimination and retaliation with Walsh.

69.     On January 29, 2020, while meeting with Walsh, Hood reported to him that Huff and Barber continue to retaliate against him (Hood) for bringing forward race discrimination and wage disparities.

70.     Walsh did not investigate nor correct the retaliatory actions taken against Hood for bringing forward race discrimination and wage disparities.

71.     As a result of Hood's investigation findings that the white supervisor had discriminated and caused a racially hostile environment, the supervisor was terminated.

72.     On February 13, 2020, two (2) weeks after Hood completed his investigation, Walsh put Hood on a Performance Improvement Plan ("PIP"), even though Hood had received a superior performance evaluation on December 31, 2019.

73.     Hood had not received any prior verbal or written warnings regarding performance before February 13, 2020.

74.     Hood was given no specific or detailed reasons for the PIP.

75.     On February 28, 2020, Hood told Huff directly that he felt that she was retaliating against him for bringing forward race discrimination complaints and race wage disparities.

76.     One week later, on March 5, 2020, Hood was suspended supposedly to allow for an investigation of some unidentified wage discrepancies.

77.     Walsh locked Hood out of his computer, collected his keys and badge, requested his company laptop, and had Hood escorted out of the building; none of which is standard procedure for a suspension pending investigation of wage discrepancies at Heartland.

78.     On March 12, 2020, two (2) weeks after Hood reported retaliation for bringing forward race discrimination and wage disparities, Hood was terminated without any explanation other than a bare statement that he was not performing his duties.

79.     In April 2020, Huff directed that Hood be sent a medical bill from Heartland for approximately $11,000 for medical services received in 2019 even though that amount was to be written off as an employee benefit.

80.     On January 28, 2020, Hood applied for intermittent FMLA to assist his mother who had a serious medical condition.

81.     On January 30, 2020, Walsh told Hood he would be the one who would have to approve his FMLA.

82.     Walsh scolded Hood for not advising him (Walsh) that he was going to file FMLA before actually applying for FMLA.

83.     Walsh insisted Hood disclose the specific medical issues related to Hood's mother that led to Hood applying for parental FMLA, even though Heartland's FMLA was handled by a third party administrator, Unum ("Unum").

84.     On February 13, 2020, two (2) weeks after Walsh scolded Hood for filing for parental FMLA without his approval, Walsh gave Hood a Performance Improvement Plan ("PIP").

85.     On March 5, 2020, Walsh suspended Hood without any details for such suspension.

86.     Walsh told Hood that Weems and Johnson would investigate the accusations, but neither did.

87.     On March 5, 2020, Hood's doctor placed him on medical leave from work because of Hood's own serious medical condition.

88.   On March 6, 2020, Hood applied for personal FMLA due to extreme anxiety and depression caused by Walsh's and Huff's actions.

89.   On March 6, 2020, Hood received a notice of his eligibility for personal FMLA.

90.   On March 8, 2020, Hood emailed Johnson a Notice of Retaliatory Adverse Action.

91.   Hood was terminated by a letter dated March 12, 2020.

92.   On March 23, 2020, Hood received a parental FMLA approval notice from Unum, Heartland's FMLA administrator.

93.   On March 30, 2020, Hood received Employee FMLA approval notice from Unum.

## COUNT I

### RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII
### AGAINST DEFENDANT HEARTLAND

94.   Plaintiff incorporates Paragraphs 1 through 79 as though fully set forth herein.

95.   As a direct and proximate result of Defendant Heartland's unlawful conduct, as described in these paragraphs, Hood was subjected to unlawful racial discrimination in violation of Title VII.

96.   As a direct and proximate result of Defendant Heartland's unlawful conduct, Hood has suffered and will continue to suffer the loss of his employment and career, including loss of salary, wages, bonuses, benefits, and other compensation which such employment entails, as well as future pecuniary losses.

97.   As a direct and proximate result of Defendant Heartland's unlawful conduct, Hood has suffered and will continue to suffer humiliation, embarrassment, degradation, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

98.    The unlawful conduct of Heartland was done with malice and/or reckless indifference of the legal rights and interests of Hood so as to entitle him to an award of punitive damages.

## COUNT II

## RETALIATION IN VIOLATION OF TITLE VII BY HEARTLAND

99.    Plaintiff incorporates Paragraphs 1 through 79 as though fully set forth herein

100.    Hood was retaliated against because he opposed unlawful racial discrimination.

101.    As a direct and proximate result of Defendant Heartland's unlawful conduct, as described in these paragraphs, Hood was subjected to retaliation in violation of Title VII.

102.    As a direct and proximate result of Defendant Heartland's unlawful conduct, Hood has suffered and will continue to suffer the loss of his employment and career, including loss of salary, wages, bonuses, benefits, and other compensation which such employment entails, as well as future pecuniary losses.

103.    As a direct and proximate result of Defendant Heartland's retaliation conduct, Hood has suffered and will continue to suffer humiliation, embarrassment, degradation, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

104.    The retaliation conduct of Heartland was done with malice and/or reckless indifference of the legal rights and interests of Hood so as to entitle him to an award of punitive damages.

## COUNT III

## RACIAL DISCRIMINATION IN VIOLATION OF THE ILLINOIS HUMAN RIGHTS ACT AGAINST DEFENDANT HEARTLAND

105.    Plaintiff incorporates Paragraphs 1 through 79 as though fully set forth herein.

106.   As a direct and proximate result of Defendant Heartland's unlawful conduct, as described in these paragraphs, Hood was subjected to unlawful racial discrimination in violation of the Illinois Human Rights Act.

107.   As a direct and proximate result of Defendant Heartland's unlawful conduct, Hood has suffered and will continue to suffer the loss of his employment and career, including loss of salary, wages, bonuses, benefits, and other compensation which such employment entails, as well as future pecuniary losses.

108.   As a direct and proximate result of Defendant Heartland's retaliation conduct, Hood has suffered and will continue to suffer humiliation, embarrassment, degradation, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

109.   The unlawful conduct of Heartland was done with malice and/or reckless indifference of the legal rights and interests of Hood so as to entitle him to an award of punitive damages.

## COUNT IV

## RETALIATION IN VIOLATION OF ILLINOIS HUMAN RIGHTS ACT AGAINST DEFENDANT HEARTLAND

110.   Plaintiff incorporates Paragraphs 1 through 79 as though fully set forth herein

111.   Hood was retaliated against for his complaints to Heartland and various supervisors.

112.   As a direct and proximate result of Defendant Heartland's unlawful conduct, as described in these paragraphs, Hood was subjected to unlawful racial discrimination in violation of Title VII the Illinois Human Rights Act.

113.   As a direct and proximate result of Defendant Heartland's unlawful conduct, Hood has suffered and will continue to suffer the loss of his employment and career, including loss

of salary, wages, bonuses, benefits, and other compensation which such employment entails, as well as future pecuniary losses.

114.    As a direct and proximate result of Defendant Heartland's retaliation conduct, Hood has suffered and will continue to suffer humiliation, embarrassment, degradation, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

115.    The unlawful conduct of Heartland was done with malice and/or reckless indifference of the legal rights and interests of Hood so as to entitle him to an award of punitive damages.

## COUNT V

## RETALIATION IN VIOLATION OF 42 USC § 1981 AGAINST DEFENDANT HEARTLAND, WALSH, AND HUFF

116.    Plaintiff incorporates Paragraphs 1 through 79 as though fully set forth herein.

117.    As a direct and proximate result of Defendants unlawful conduct, as described in these paragraphs, Hood was subjected to unlawful retaliation in relation to his contract of employment with Heartland for opposition to racial discrimination.

118.    Hood was retaliated against and ultimately terminated for his opposition to Defendants of unlawful racial discrimination.

119.    As a direct and proximate result of Defendants' retaliatory conduct, Hood has suffered and will continue to suffer the loss of his employment and career, including loss of salary, wages, bonuses, benefits and other compensation which such employment entails, as well as future pecuniary losses.

120.    As a direct and proximate result of Defendants' retaliatory conduct, Hood has suffered and will continue to suffer humiliation, embarrassment, loss of enjoyment of life, and other non-pecuniary losses.

13

121. The retaliatory conduct of Defendants' was done with malice and/or reckless indifference of the legal rights and interests of Hood so as to entitle him to an award of punitive damages.

WHEREFORE, Plaintiff Hood respectfully requests that this Court enter judgment in Courts I-V in favor of Plaintiff Hood and against Defendant Heartland as follows:

a)      That a finding be entered that Heartland intentionally discriminated and retaliated against Hood with malice or reckless indifference to Hood's federally protected rights in violation of Title VII of the Civil Rights Act of 1964, amended by the Civil Rights Act of 1991, the Illinois Human Rights Act, and 42 U.S.C § 1981;

b)      That Plaintiff Hood be awarded all wages, benefits, and compensation lost due to Heartland's unlawful conduct, including back pay and all future pecuniary losses;

c)      That Plaintiff Hood be awarded compensatory damages for pain and suffering, loss of enjoyment of life, damage to reputation, and humiliation in amounts to be determined at trial;

d)      That Plaintiff Hood be awarded punitive damages from Heartland;

e)      That Plaintiff Hood be awarded prejudgment interest;

f)      That Plaintiff Hood be awarded reasonable attorney's fees and costs, and;

g)      That Plaintiff Hood be awarded such other relief as this Court may deem just and proper.

## **COUNT VI**

### **INTERFERENCE WITH PLAINTIFF HOOD'S FMLA RIGHTS BY DEFENDANTS HEARTLAND, WALSH, AND HUFF**

122. Plaintiff incorporates Paragraphs 1 - 13 and 80 - 93 as though fully set forth herein.

123.    Hood's termination, after qualifying for, initiating and receiving approval for FMLA leaves, interfered with his FMLA rights, by in part, by denying him on going health insurance coverage and his rights to return to his job and its monetary benefits.

## COUNT VII

## RETALIATION UNDER FMLA

124.    Plaintiff incorporates Paragraphs 1-13 and 80-93 as though fully set forth herein.

125.    Plaintiff's termination was in retaliation by all Defendants for exercising his FMLA rights intermittent and continuous.

WHEREFORE, Plaintiff Hood prays for judgment against all Defendants, jointly and/or severally for Counts VI and VII, as follows:

a)    Statutory damages for past lost wages, benefits, and other compensation, plus interest thereon at the statutory rate;

b)    Additional liquidated damages in the amount equal to the above-requested award for Defendants' willful malicious and/or reckless exercise of his FMLA rights;

c)    Equitable relief in the form of reinstatement or front pay, as the Court deems appropriate;

d)    Attorney's fees and costs of this action, and

e)    Such other relief as this Court deems just and proper.

## COUNT VIII

## WHISTLEBLOWER ACT AGAINST DEFENDANT HEARTLAND

126.    Plaintiff incorporates Paragraphs 1 through 79 as though fully set forth herein.

127.    At all material times, Hood was an employee within the meaning of the Whistleblower Act, ("Whistleblower Act") 740 ILCS 174/1 *et seq*.

128. At all material times, Heartland was an employer within the meaning of the Whistleblower Act in that Heartland is a corporation with one or more employees in Illinois.

129. Heartland unlawfully retaliated against Plaintiff Hood for refusing to participate in violations of the law including, but not limited to:

   a) The Illinois Human Rights Act, 775 ILCS 5, *et seq*. which prohibits employers retaliating for opposing race discrimination;

   b) Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq*. which prohibits employers from retaliating for opposing race discrimination;

   c) The Civil Rights Act of 1866, 42 U.S.C. § 1981 which prohibits employers from retaliating for opposing race discrimination.

130. Heartland's actions of retaliation were willful, malicious and/or in reckless disregard for Plaintiff's opposition to race discrimination.

   WHEREFORE, Plaintiff Hood respectfully requests that this Court enter judgment in Courts VI-VIII in favor of Plaintiff Hood and against Defendant Heartland as follows:

   a) That a finding be entered that Heartland intentionally discriminated against Hood with malice or reckless indifference to Hood's protected activities under State and Federal non-discrimination laws;

   b) That Plaintiff Hood be awarded all wages, benefits, and compensation lost due to Heartland's unlawful conduct, including back pay and all future pecuniary losses;

   c) That Plaintiff Hood be awarded compensatory damages for pain and suffering, loss of enjoyment of life, damage to reputation, and humiliation in amounts to be determined at trial;

   d) That Plaintiff Hood be awarded punitive damages from Heartland;

   e) That Plaintiff Hood be awarded prejudgment interest.

16

f)      That Plaintiff Hood be awarded reasonable attorney's fees and costs, and;

g)      That Plaintiff Hood be awarded such other relief as this Court may deem just and proper.

Respectfully submitted
Samuel C. Hood, Jr., Plaintiff

By:  /s/ Shari R. Rhode

Shari R. Rhode, Attorney for Plaintiff
Bar No. 2324598
Rhode Law Firm
1405 West Main Street
Carbondale, IL 62901
Phone: 618.549.4287
Fax: 618.549.4343
Email: shari@rhodelawfirm.com